UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------X

D.B. and M.B., on behalf of K.B.,

Plaintiffs,

-against-

NEW YORK CITY DEPARTMENT OF EDUCATION,

Defendant.

---------------------------------------X

10 Civ. 6183

OPINION

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10-12-11

**Sweet, D.J.**

Plaintiffs D.B. and M.B., suing on behalf of K.B., (collectively, the "Plaintiffs") have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. Defendant New York City Department of Education ("DOE" or the "Defendant") has filed a cross-motion for summary judgment pursuant to the same Rule. For the following reasons, the DOE's motion for summary judgment is granted, and Plaintiffs motion is denied.

## I. Prior Proceedings

On August 17, 2010, Plaintiffs D.B. and M.B. filed suit on behalf of K.B., appealing from the May 19, 2010 decision

of the State Review Officer ("SRO"). The SRO reversed the February 2, 2010 decision of the Impartial Hearing Officer ("IHO") and found that Defendant had provided K.B. with a free appropriate public education ("FAPE") for the 2008-2009 school year. On March 7, 2011, Plaintiffs moved for summary judgment. On April 11, 2011, Defendant cross-moved for summary judgment. Oral argument on both motions was held on May 25, 2011.

## II. <u>Statement of Facts</u>

Both Plaintiffs and Defendant have submitted a Statement of Material Facts pursuant to Local Rule 56.1. The following facts, which are not in dispute except as noted, have been established by these submissions or from the evidentiary record the parties have submitted.

K.B. is the daughter of D.B. and M.B. Prior to the 2008-2009 school year, K.B. attended the private Manhattan Day School, where K.B. received educational instruction in classes of no more than ten students.

In January 2008, Plaintiffs hired Sheri Silverman, Psy.D. to evaluate K.B. The following month, Dr. Silverman

prepared a psycho-educational evaluation of K.B. entitled "Learning Style Profile" in which Dr. Silverman set forth her professional observations regarding K.B.'s educational needs, including the opinion that K.B. met the diagnostic criteria for Attention Deficit Hyperactivity Disorder-Combined Type ("ADHD"). Dr. Silverman's report also stated that K.B. presented with a Learning Disorder-Not Otherwise Specified ("LD-NOS"), a diagnostic criterion used where students present with "deficits in all domains, which are impacted by processing deficits, which impact their ability in either reading, math, written language, or all of the above, but they don't meet criteria for a specific learning disability." Dr. Silverman's evaluation also provided an assessment of K.B.'s reading fluency, math fluency, language/vocabulary, processing speed, and memory, concluding that K.B.'s abilities in several subjects were below-grade level and that remedial techniques, various testing and other accommodations were appropriate for K.B. The report described K.B.'s IQ as within the average range. In addition to Dr. Silverman's evaluation, D.B. and M.B. also hired Ms. S. Rosenrauch to prepare a speech and language evaluation of K.B. Ms. Rosenrauch's report recommended that K.B. receive speech-language therapy services to improve her vocabulary, inferencing

skills, comprehension of idiomatic language, long term memory storage, and retrieval skills.

On March 25, 2008, a Committee on Special Education ("CSE") meeting was held to develop K.B.'s Individualized Education Plan ("IEP") for the 2008-2009 school year. The CSE was comprised of K.B.'s mother, a general education teacher, a psychologist who also served as a school district representative, a parent member, and a special education teacher and a special education administrator from the Manhattan Day School. Plaintiffs allege that K.B.'s mother and then-current teachers were not included as full team members at the meeting, but Defendants dispute this fact. The reports of both Dr. Silverman and Ms. Rosenrauch were submitted to the CSE. While Defendant states that these reports were reviewed, Plaintiffs argue that "DOE barely glanced at" the reports.

The CSE recommended that K.B. be placed in a 13:1 Collaborative Team Teaching ("CTT") class, an instructional setting for both general education and special education students taught by one special education teacher and one general education teacher, and that K.B. be provided with weekly 45-minute individual sessions of speech and language therapy as

well as weekly 45-minute individual counseling sessions. Defendant avers that, consistent with State regulations, the student to teacher ratio would have been modified to 12:1. The CSE also recommended that K.B. be provided with various testing accommodations, including extended time, having questions and directions read and reread aloud, and taking exams in a separate location. The IEP created by the CSE did not state that K.B. wore contact lenses, did not indicate that K.B. had ADHD or LD-NOS, included an erroneous reference to a student named "Yoni," used the pronoun "he" even though K.B. is female, and, at one point, misidentified K.B.'s grade level. Defendant describes the IEP as setting forth appropriate goals and short-term objectives, while Plaintiffs believe the goals and objectives to be insufficient under New York State Education Law requirements.

Prior to receiving the DOE's notice regarding recommended placement, Plaintiffs applied to the Parents for Torah for All Children program of Yeshiva University High School for Girls ("P'TACH"), a private school. According to testimony from P'TACH's educational director presented at the Impartial Hearing, Plaintiffs submitted K.B.'s application for admission for the 2008-2009 school year in either December 2007 or January

2008. K.B. interviewed at the school, and D.B. and M.B. paid a $2,000 deposit in May 2008.

By letter dated June 19, 2008, the DOE issued Plaintiffs a Final Notice of Recommendation, which identified High School for Law and Public Service as the specific school placement for K.B. for the 2008-2009 school year. The High School for Law and Public Service offered one ninth grade CTT class during the 2008-2009 year. The class had thirty students total. At the start of the academic year, the class had eleven special education students, and a twelfth student was added later on. In the proposed class, the special education students' academic levels ranged from second grade through eighth grade. Plaintiff states that by the time they received the DOE's placement recommendation, classes had ended, so D.B. and M.B. were unable to visit the program. On July 7, 2008, Plaintiffs sent a letter to DOE officials stating that until Plaintiffs received answers to enclosed questions and had a chance to visit the recommended school while classes were in session, they would keep K.B. in her current placement and seek reimbursement for that placement.

On August 1, 2008, Plaintiffs signed a contract to enroll K.B. at P'TACH for the 2008-2009 school year. Total tuition for the 2008-2009 school year was $34,400.00. D.B. and M.B. also acquired private transportation for K.B., totaling $4,050.00. Plaintiffs state that they could have opted out of the contract with P'TACH on or before September 1, 2008 and would have to forfeit only $500. On August 15, 2008, Plaintiffs sent a letter to DOE officials stating that the CSE's proposed high school and program were not discussed at the March 25 meeting, that Plaintiffs wished to visit the CSE's proposed high school while classes were in session but had been unable to do so on account of the recommendation being dated June 19, that Plaintiffs would be sending K.B. to P'TACH and seeking reimbursement, and that Plaintiffs would be in touch again after visiting the CSE's proposed high school while classes were in session. Plaintiffs state that they received no response to this letter and that, in addition to writing, Plaintiffs called the high school but no calls were returned. A review of telephone records included with Plaintiffs exhibits reveals two telephone calls were made: one on August 20, 2008 and one on September 5, 2008.

On September 10, 2008, Plaintiffs wrote to DOE officials stating that their questions had not been answered, they lacked information about the recommended school, and they did not think it would be appropriate to withdraw K.B. from her current school after it had begun. The letter again informed DOE of Plaintiffs intent to send K.B. to P'TACH and that Plaintiffs would be seeking reimbursement for the costs of tuition, expenses and transportation. Plaintiffs again wrote to DOE officials on November 24, 2008, requesting an administrative impartial hearing to obtain reimbursement for the total cost of tuition at P'TACH, the related expenses, and the private transportation Plaintiffs secured for the 2008-2009 school year.

K.B. attended P'TACH for the entire 2008-2009 school year and D.B. and M.B. secured private transportation for K.B. to travel between their home and school. At the hearing before the IHO, Dr. Judah Weller, P'TACH's Educational Director, testified that K.B. was in a special education class with five to seven other students, she had the opportunity to work one-on-one with teachers during two weekly homework periods, and that she participated in a weekly social skills group. Plaintiffs fulfilled their obligation to pay K.B.'s tuition at P'TACH.

On April 13, 2009, Plaintiffs filed an amended request for an impartial hearing, seeking reimbursement for tuition and transportation, and the case was captioned IHO Case No. 119447. An impartial hearing was held over five days from April through October 2009. By Findings of Fact and Decision dated February 2, 2010, the Impartial Hearing Officer ("IHO") awarded Plaintiffs reimbursement for tuition, registration, dinner, and Scrip fees as well as K.B.'s private transportation. The DOE appealed the IHO's decision to the New York State Education Department's Office of State Review. In a decision dated May 19, 2010, the State Review Officer ("SRO") found that the DOE's recommended program was appropriate for K.B. Accordingly, the SRO reversed the IHO's decision and denied Plaintiffs' claim for reimbursement.

## III. The IHO Decision

After a five-day hearing, the IHO awarded Plaintiffs reimbursement for K.B.'s tuition, transportation, and other expenses. The IHO applied the three-prong test provided by the Supreme Court ("the Burlington-Carter test"), evaluating whether the services offered by the District are inadequate or inappropriate ("first criterion"), whether the services selected

by the parent are appropriate ("second criterion"), and whether equitable considerations support the parents' claim for reimbursement ("third criterion"). See Sch. Comm. of the Town of Burlington v. Dep't of Educ., Mass., 471 U.S. 359 (1985); Florence County Sch. Dist. Four et al. v. Carter by Carter, 510 U.S. 7 (1993).

In evaluating the first criterion, the IHO concluded that the district failed to offer K.B. a FAPE. In reaching this finding, the IHO heavily weighed the evaluation of Dr. Silverman. While Dr. Silverman's report detailed K.B.'s ADHD and her processing issues and presented various remedial approaches designed to address these issues, the IHO found that the IEP did not indicate that K.B. suffered from attentional or processing difficulties nor did it provide for any of the interventions Dr. Silverman recommended, even though there was no other psycho-educational evaluation available. Furthermore, the recommended academic management needs in the IEP were not "yoked to attentional concerns." The IHO also noted that the IEP did not provide speech and language therapy three times a week as recommended in by Ms. Rosenrauch, the speech therapist hired by Plaintiffs. Class size was also a factor in the decision, with the IHO noting that both Dr. Silverman and K.B.'s

then-current teachers at Manhattan Day School recommended a small class size, yet class size under the CSE-recommended program could be large as thirty students. The IHO found that, by not adequately considering the suggestions in the reports of Dr. Silverman and Ms. Rosenrauch, the CSE impermissibly "predetermined" the result in this matter.

Regarding the second criterion, the IHO ruled that P'TACH provided K.B. with an appropriate educational environment. Crediting the small class size and individualized attention, the IHO recognized K.B.'s social and academic progress while enrolled at P'TACH. Although the DOE argued correctly that P'TACH did not provide speech services, the IHO noted that the school did provide assistance to K.B. with her vocabulary and memory and that it can be appropriate to order reimbursement even if a particular school does not provide each and every special education service. DOE's other arguments, including an argument that P'TACH did not provide the least restrictive environment and an argument that the record did not provide sufficient detail concerning the functional grouping in P'TACH classes, were also rejected.

On the third criterion concerning equitable considerations, the IHO found that K.B.'s parents had done all that had been requested of them by participating in CSE meetings and actively seeking the District's input concerning the best options for K.B. The IHO was not persuaded by DOE's argument that K.B.'s parents already arranged for K.B.'s attendance at P'TACH prior to the CSE's recommendation, stating that the contract indicated that the parents would forfeit only $500 and that the parents signaled in letters that they were open to a public school placement.

## IV. <u>**The SRO Decision**</u>

The Department of Education appealed the IHO's decision to the New York State Education Department's Office of State Review. The SRO reversed the IHO's decision, finding that the DOE had provided K.B. with a FAPE in the least restrictive environment.

In arriving at his decision, the SRO looked in detail at the results of the battery of tests given to K.B. by Ms. Silverstein and Ms. Rosenrauch, as well as the testimony of Ms. Cecilia Perez, who attended the CSE as the school district's

school psychologist. The SRO found that the IEP sufficiently documented K.B.'s strengths and weaknesses and set up a program designed to address her weaknesses in the least restrictive way possible. The IEP included counseling, speech-related services, and testing and other accommodations to address K.B.'s attention and processing difficulties. The SRO also noted that the IEP included nine annual goals and forty corresponding short-term objectives to address K.B.'s needs.

The SRO relied primarily on the testimony of Ms. Perez in finding that all of the participants and reports involved in the CSE meeting were given adequate attention and consideration, and that all of the concerns raised in the meeting were sufficiently addressed. The SRO found that the IEP was appropriate even though it did not include all of the recommendations and requests from the Manhattan Day School staff, the expert reports, and K.B.'s parents.

The SRO went on to find that the CTT class size and constitution were correct, as the class provided the resources K.B. needed and K.B.'s weaknesses did not warrant a more restrictive environment. The SRO noted that several instruction techniques available in the CTT class environment were tailored

to K.B.'s needs and that after-school tutoring and other similar programs were available to help struggling students. Ultimately, the SRO held that the DOE had offered a FAPE in the least restrictive environment. Having come to that conclusion, the SRO did not consider the merits of P'TACH or the equitable considerations of the Plaintiffs' demand for reimbursement.

## V. The Individuals with Disabilities Education Act, Individualized Educational Programs, and Administrative Review Procedures

The Individuals with Disabilities Education Act (the "IDEA" or the "Act"), 20 U.S.C. § 1400 et seq., requires states receiving federal funding to provide children with disabilities with a FAPE. 20 U.S.C. § 1412(a)(1)(A); Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 107 (2d Cir. 2007). Under the IDEA, a FAPE must provide "special education and related services tailored to meet the unique needs of a particular child" that are "'reasonably calculated to enable the child to receive educational benefits.'" Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 112 (2d Cir. 1998) (quoting Bd. of Educ. v. Rowley, 458 U.S. 176, 207, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)).

The procedures prescribed in the Act require the school district to develop an annual "individualized education program" ("IEP") for the child that is tailored to the disabled student's needs. 20 U.S.C. § 1414(d). The IEP is a written program of instruction that "sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." Honig v. Doe, 484 U.S. 305, 311, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988). Under New York Education Law, the creation of IEPs is delegated to a local Committee on Special Education ("CSE"), which includes parents, teachers, at least one psychologist, school board representatives, and others. N.Y. Educ. L. § 4402. In New York City, the Department of Education ("DOE") is the entity responsible for developing IEPs. See A.D. v. Bd. of Educ., 690 F. Supp. 2d 193, 197 (S.D.N.Y. 2010) (citing N.Y. Educ. L. § 4402).

Parents who believe that the state has failed to provide their child with a FAPE "may, at their own financial risk, enroll the child in a private school and seek retroactive

reimbursement for the cost of the private school from the state." Gagliardo, 489 F.3d at 111; 20 U.S.C. § 1412(a)(10)(C)(ii). The Supreme Court has articulated a three-prong test ("the Burlington-Carter test") to determine whether a parent is entitled to reimbursement for a private placement: (1) the educational program recommended by the IEP failed to provide a FAPE suited to the child's needs; (2) the alternative private placement or additional services obtained by the parents were appropriate; and (3) equitable factors weigh in favor of reimbursement. Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 12-13, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993); Burlington Sch. Comm. v. Dep't of Educ., 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985); see also R.B. v. New York City Dep't of Educ., 713 F. Supp. 2d 235, 238 (S.D.N.Y. 2010) (citing T.Y. v. New York City Dep't of Educ., 584 F.3d 412, 417 (2d Cir. 2009)). The IDEA also requires that the special education program be provided in the least restrictive environment, meaning the student is to be educated with non-disabled peers to the "maximum extent appropriate." 20 U.S.C. § 1412(a)(5); Walczak, 142 F.3d at 122. Only "when the nature or severity" of a child's disability is such "that education in regular classes with the use of supplementary aids and services cannot be

achieved satisfactorily" should a child be segregated. 20 U.S.C. § 1412(a)(5).

New York State has implemented a two-tiered system of administrative review for parents who are dissatisfied with their child's IEP. First, parents may obtain an impartial hearing before an IHO. N.Y. Educ. L. § 4404(1)(a). Second, the decision of the IHO can subsequently be appealed to the SRO. N.Y. Educ. L. § 4404(2). After exhausting this two-step administrative process, any party still dissatisfied may bring a civil action in state or federal court. N.Y. Educ. L. § 4404(3); 20 U.S.C. § 1415(i)(2)(A).

## VI. The Summary Judgment Standard in Actions Brought Under The IDEA

IDEA actions in federal court are often resolved on summary judgment motions. See, e.g., M.N. v. New York City Dep't of Educ. Region 9 (Dist. 2), 700 F. Supp. 2d 356, 369 (S.D.N.Y. 2010); J.R. v. Bd. of Educ. of City of Rye Sch. Dist., 345 F. Supp. 2d 386, 394 (S.D.N.Y. 2004). In adjudicating motions for summary judgment brought in IDEA actions, the existence of a disputed issue of fact will not necessarily

defeat the motion for summary judgment. P.K. ex rel. P.K. v. Bedford Cent. Sch. Dist., 569 F. Supp. 2d 371, 382 (S.D.N.Y. 2008). Instead, the court "must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence." Gagliardo, 489 F.3d at 112.

In reviewing state administrative proceedings, the federal courts conduct a "modified de novo" review, M.N., 700 F. Supp. 2d at 364, evaluating the claims using a preponderance of the evidence standard. 20 U.S.C. § 1415(i)(2)(C)(iii). However, administrative decisions are given "due weight," and courts should "by no means . . . substitute their own notions of sound educational policy for those of the school authorities they review." Walczak, 142 F.3d at 129; see also Davis v. Wappingers Cent. Sch. Dist., No. 10-1160-cv, 2011 WL 2164009, at *1 (2d Cir. June 3, 2011) (requiring reviewing courts "to give due weight to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy."). If a conflict exists between the SRO and the IHO, the district court defers to the SRO's decision. Karl ex rel. Karl v. Bd. of Educ. of Geneseo Cent. Sch. Dist., 736 F.2d 873, 877 (2d Cir. 1984) ("We believe

Rowley requires that federal courts defer to the final decision of the state authorities, and that deference may not be eschewed merely because a decision is not unanimous or the reviewing authority disagrees with the hearing officer.").

The district court applies the three-factor "Burlington-Carter test" outlined above. See, e.g., R.E. v. New York City Dep't of Educ., No. 10 Civ. 3176, 2011 WL 924895, at *6 (S.D.N.Y. Mar. 15, 2011); Mr. and Mrs. A. ex rel. D.A. v. New York City Dep't of Educ., 769 F. Supp. 2d 403, 414 (S.D.N.Y. 2011). School districts bear the burden of demonstrating that the IEPs they develop are appropriate, while parents bear the burden of showing the private schools they have chosen provided an appropriate program. N.Y. Educ. L. § 4404(1)(c); G.B. ex rel. N.B. v. Tuxedo Union Free Sch. Dist., 751 F. Supp. 2d 552, 573 (S.D.N.Y. 2010).

## VII. The Educational Program Recommended by the IEP Provided a FAPE to K.B.

The first prong of the "Burlington-Carter test" requires the district court to determine whether the educational program recommended by the IEP failed to provide a FAPE suited

to the child's needs. In conducting its review of an IEP, a district court must address two issues: (1) whether the state complied with the procedural requirements of the IDEA, and (2) whether the challenged IEP was "reasonably calculated to enable the child to receive educational benefits." Walczak, 142 F.3d at 129. The district court is obligated to review the IEP without "impermissible meddling in state educational methodology," thereby requiring the court to examine the record for "objective evidence" indicating whether the student is likely to make progress or regress under the proposed plan. Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1121 (2d Cir. 1997). A review of the evidentiary record submitted by the parties establishes that the DOE complied with the procedural requirements of the IDEA in formulating K.B.'s IEP and that the IEP proposed was reasonably calculated to confer educational benefits to K.B.

### a. The DOE Complied with the IDEA's Procedural Requirements in Formulating K.B.'s IEP

"The initial procedural inquiry in an IDEA case 'is no mere formality,' as 'adequate compliance with the procedures prescribed would in most cases assure much if not all of what

Congress wished in the way of substantive content in an IEP.'" A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist., 553 F.3d 165, 172 (2d Cir. 2009). Both Congress and the Supreme Court have placed emphasized the significance of the IDEA's procedural provisions. Evans v. Bd. of Educ. of Rhinebeck Cent. Sch. Dist., 930 F. Supp. 83, 93 (S.D.N.Y. 1996). However, not all procedural defects are fatal to an IEP. See W.T. and K.T. ex rel. J.T. v. Bd. of Educ. of Sch. Dist. of New York City, 716 F. Supp. 2d 270, 287 (S.D.N.Y. 2010) ("[A]lthough a material violation of the procedural requirements may result in the denial of a FAPE, it does not follow that every procedural violation will automatically render the IEP legally inadequate under the IDEA."). The IDEA is violated when procedural defects impede a student's right to a FAPE, significantly impede the parents' opportunity to participate in the decision-making process concerning the development of an IEP and placement, or cause a deprivation of the student's educational benefits. 20 U.S.C. § 1415(f)(3)(E)(ii); 34 C.F.R. § 300.513(a)(2).

The DOE has contended that K.B.'s IEP complied with the IDEA's procedural requirements, noting that the IEP contained the required information prescribed in the statute.

Def.'s Memo. at 7-12. Plaintiffs, however, contend that the IEP was deficient in that it contained only vague descriptions of K.B.'s present levels of performance, failed to develop appropriate and objectively measurable goals, and failed to provide an appropriate transition plan for K.B. Pls.' Memo. at 6-9.

The IDEA requires that the DOE develop an IEP that describes: (1) "the child's present levels of academic achievement and functional performance;" (2) "measurable annual goals," accompanied by; (3) "how the child's progress toward meeting the annual goals . . . will be measured;" (4) "the special education and related services . . . to be provided to the child;" (5) the extent to which the student will be mainstreamed and the justification for the determination; (6) "a statement of any individual appropriate accommodations that are necessary" for testing; and (7) "the projected date for the beginning of the services . . . and the anticipated frequency, location, and duration of those services." 20 U.S.C. § 1401(14); 20 U.S.C. § 1414(d)(1)(A)(i).

K.B.'s IEP contained all of these necessary elements. Plaintiffs argue that the IEP contained vague descriptions of

K.B.'s then-present performance levels, stating that the CSE's failure to consider adequately the reports of Dr. Silverman and Ms. Rosenrauch resulted in an IEP that did not provide the interventions these reports recommended. Pls.' Memo. at 6. Additionally, Plaintiffs contend that, notwithstanding the consensus that K.B. suffers from attentional issues, the IEP fails to mention K.B.'s ADHD or its symptoms, nor does the IEP adequately describe K.B.'s processing issues, her reading weakness, her vision difficulties, or the areas where K.B.'s comprehension skills were strong. Id. Plaintiffs also note that, in testimony DOE presented at the impartial hearing, the Assistant Principal for Special Education at the IEP's proposed school, acknowledged the IEP's description of K.B.'s skills as "vague." Id. at 6-7. However, the IEP contained a detailed description of K.B.'s "Academic Performance and Learning Characteristics," describing her then-present abilities with respect to various school subjects, including phonetics, decoding, reading, writing, capitalization, punctuation, grammar, spelling, vocabulary, and mathematics. Dist. Ex. 4 at 3. The report documented K.B.'s abilities with some specificity noting, for example, that K.B. "understands how to solve two step algebraic equations" but "does not, however, always remember the rules of sign integers and their application." Id.

The report also contained information concerning K.B.'s "Social/Emotional Performance" as well as her "Health and Physical Development." Id. at 4, 5.

In addition to describing K.B.'s then-present abilities, IEP provided measurable goals with respect to K.B.'s progress in mathematics, writing, grammar, spelling and vocabulary. Id. at 6-11. Plaintiffs contend that the CSE failed to develop appropriate and objectively measurable goals and objectives, thereby limiting K.B.'s progress by permitting the two teachers in the IEP's recommended CTT program to work on the IEP's goals and objectives in different manners. Pls.' Memo. at 7. Plaintiffs also argue that the school psychologist and general education teacher who developed K.B.'s goals lacked familiarity with K.B., and that the SRO ignored contrary testimony in finding that teachers from K.B.'s then-current school had participated in developing the goals. Pls.' Memo. at 8. However, as noted by the DOE, six pages of the IEP are dedicated to "Annual Goals and Short Term Objectives," and the goals identified in these pages present measureable objectives. See Dist. Ex. 4 at 6-11. For example, the IEP includes the objectives that K.B. "will solve at least 20 algebraic equations containing one or two unknowns (x and/or y variables) and

utilize the four operations, with at least an 80% level of accuracy," "will demonstrate the use of higher order thinking skills to comprehend texts on grade level she has read by responding to questions based upon five reading selections that are teacher selected with 80% accuracy," and "will produce a three to four paragraph composition on a topic of her choice." Id. at 6, 7. In addition, there are short term objectives providing incremental steps toward achieving the annual goals. Id. at 6-11.

Along with K.B.'s "present levels of academic achievement and functional performance" along with "measureable annual goals" accompanied by "how the child's progress toward meeting the annual goals . . . will be measured," the IEP contained the remaining elements the IDEA requires. Included in the IEP is the recommendation that K.B. be assigned to a "special class environment" for 35 periods per week with a staffing ratio of 13:1. Id. at 12. The IEP recommended "counseling, speech and language therapy" support, with counseling sessions and speech and language therapy sessions occurring once a week, one-on-one, for 45 minutes per week. Id. at 14. The IEP also suggests that K.B. have special testing accommodations including a separate location, extended time, and

having directions read aloud, Id. at 14, but that K.B. be afforded full participation in lunch, assemblies, trips and other school activities. Id. at 14.

Plaintiffs contend that the CSE failed to prepare an appropriate transition plan for K.B., Pls.' Memo. at 8-9, but the IEP described K.B.'s diploma objective, future community integration, post-secondary placement, independent living, and employment. Dist. Ex. 4 at 15. Thus, K.B.'s IEP contained all the elements required under the statute.

In addition to containing the required information, the IEP was developed through a fair and informed process. In developing K.B.'s IEP, the record illustrates how the CSE consulted included variety of concerned individuals, including Plaintiff D.B. (K.B.'s mother), K.B.'s then-current special education teacher, the director of special education at Manhattan Day School, a regular education teacher, an additional parent member, and a school psychologist. See id. at 2. Plaintiffs contend that the reports of Dr. Silverman and Ms. Rosenrauch were not adequately considered. Pls.' Memo. at 6. However, at the impartial hearing, Cecilia Perez, a retired bilingual school psychologist who served as a member of the CSE

evaluating K.B., testified that the CSE considered Dr. Silverman and Ms. Rosenrauch's reports in evaluating K.B.'s educational needs and incorporated these experts' professional findings into the IEP. See Impartial Hr'g Tr. 60-63, 68-93, 96-99.

A review of the IEP reveals that several of the recommendations were, in fact, included. Compare Dist. Ex. 7 at 28 ("[K.B.] should be provided the opportunity for extended time (50%) on exams and standardized testing. . . . [K.B.] will require a quiet environment with minimal distractions for testing sessions.") with Dist. Ex. 4 at 14 (recommending "time extended (time & a half)" and "separate location" under "participation in assessments"). While Plaintiffs are correct that the IEP did not include every recommendation mentioned in Dr. Silverman and Ms. Rosenrauch's reports, the DOE correctly argues that omitting some recommendations of privately retained experts does not render an IEP procedurally deficient. See M.H. v. New York City Dep't of Educ., No. 10 Civ. 1042(RJH), 2011 WL 609880, at *12 (S.D.N.Y. Feb. 16, 2011) ("although a CSE is required to consider reports from private experts, it is not required to follow all of their recommendations").

Plaintiffs' argument that the IEP did not mention K.B. ADHD or ADD, see Pls.' Memo. at 7, also does not render the IEP procedurally deficient. The IEP recommended that K.B. receive various testing and classroom accommodations designed to address K.B.'s weaknesses. See Dist. Ex. 4 at 3, 14; Impartial Hr'g Tr. 71, 76-78, 86-87. The fact that the IEP provided strategies to address K.B.'s educational needs is sufficient, even if the IEP did not contain precise information regarding K.B.'s diagnosis. See A.C., 553 F.3d at 172-73 (upholding an IEP when it provided strategies for addressing the student's needs, notwithstanding the school district's failure to conduct a functional behavioral assessment in accordance with New York State regulations).

Rather than illustrate procedural defects that impeded K.B.'s right to a FAPE, significantly impeded Plaintiffs' opportunity to participate, or caused a deprivation of K.B.'s educational benefits, see 20 U.S.C. § 1415(f)(3)(E)(ii), the evidence establishes both that the IEP contained the necessary information regarding K.B.'s educational needs and that the process by which the IEP was formed incorporated input from Plaintiffs and the private professionals Plaintiffs employed. Therefore, the Court finds no procedural reason to reverse the SRO's decision.

**b. K.B.'s IEP Was Reasonably Calculated To Enable K.B. To Receive Educational Benefits**

The substantive inquiry concerning an IEP asks that the district court evaluate whether the IEP is "reasonably calculated to enable the child to receive educational benefits." Rowley, 458 U.S. at 207. "[F]or an IEP to be reasonably calculated to enable the child to receive educational benefits, it must be likely to produce progress, not regression." D.F. ex rel. N.F. v. Ramapo Cent. Sch. Dist., 430 F.3d 595, 598 (2d Cir. 2005). In evaluating whether an IEP is likely to produce progress or regression, the district court "must examine the record for any objective evidence." Walczak, 142 F.3d at 130. The IDEA mandates that states provide students education in the least restrictive environment, where children with disabilities are educated with non-disabled students "to the maximum extent appropriate." 20 U.S.C. § 1412(a)(5)(A). DOE has met its burden in proving the IEP to be reasonably calculated to confer educational benefits, as the IEP's proposed educational plan offered K.B. a FAPE in the least restrictive environment.

The IEP recommended that K.B. be placed in a CTT class with 13 special needs students and 18 general education students taught by one special education teacher and one general education teacher. Dist. Ex. 4 at 12. Plaintiffs argue that the CTT class was an inappropriate placement for K.B. because the class size was too large.[1] Pls.' Memo. at 12, 15-17. To support this argument, Plaintiffs note that K.B.'s classes at the Manhattan Day School were no larger than ten students and that, even in this small environment, Dr. Silverman's report found K.B.'s academic performance to be largely below grade level. Pls.' Memo. at 12; Dist. Ex. 7 at 3. Plaintiffs also argue that Dr. Silverman's report highlighted K.B.'s attentional issues, further cutting against a recommendation to increase K.B.'s class size. Pls.' Memo. at 12.

The IDEA mandates that special needs children be educated in the least restrictive environment where they are, to the maximum extent possible, educated with non-disabled

---

[1] The IEP states that K.B. will be assigned to a CTT with a student to teacher ratio of 13 to 1. Dist. Ex. 4 at 12. The DOE argues that this ratio would have been reduced to 12:1 after regulations were amended, see 8 N.Y.C.R.R. 200.6(g)(1), and that the class offered to K.B. would have had no more than 12 students at the time of her matriculation. Def.'s Memo. at 8 n.1. Plaintiffs note that K.B.'s IEP was not updated following the passing of the amended regulation. Pls.' Memo. at 11.

students. See 20 U.S.C. § 1412(a)(5)(A). The Second Circuit employs a two-pronged test for determining whether an IEP places a student in the least restrictive environment, considering (1) whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a given student, and, if not, (2) whether the school has mainstreamed the student to the maximum extent appropriate. See P. ex rel. Mr. and Mrs. P. v. Newington Bd. of Educ., 546 F.3d 111, 119-20 (2d Cir. 2008). Whether a special needs student can be educated satisfactorily in a regular education class with supplemental aids and services mandates consideration of "(1) whether the school district has made reasonable efforts to accommodate the child in a regular classroom; (2) the educational benefits available to the child in a regular class, with appropriate supplementary aids and services, as compared to the benefits provided in a special education class; and (3) the possible negative effects of the inclusion of the child on the education of the other students in the class." Id. at 120.

The CTT class provided K.B. the opportunity to receive a FAPE in the least restrictive environment. The IEP demonstrates K.B. to be behind grade-level in the areas of reading, spelling, writing, and mathematics, but that her

phonological, decoding, and reading comprehension skills were adequate. Dist. Ex. 4 at 3. K.B. had age-appropriate informal conversational exchanges, but she was delayed in some of her language development. Id. The IEP also found K.B. to be a compliant, cooperative child, but who had weak self-concept. Id. at. 4. After considering both K.B.'s academic strengths and weaknesses, the CSE concluded that K.B. could succeed in a CTT class. See Dist. Ex. 4 at 1; Impartial Hr'g Tr. 63-65. Ms. Perez, in her testimony before the IHO, stated that placement in a smaller, special education class would have been too restrictive given that K.B. was at or near grade level in several subject areas. Impartial Hr'g Tr. 65-66. To address K.B.'s social and emotional performance, the IEP recommended counseling, to be provided once a week on a one-to-one basis. Dist. Ex. 4 at 4. Although the class size of 30 students is larger than Plaintiffs preferred class size, the CTT class met the IDEA's objectives of fulfilling K.B.'s educational needs while mainstreaming K.B. in a regular education class to the maximum extent possible. In accordance with the Second Circuit's test laid down in Newington, the IEP afforded K.B. the least restrictive environment.

Plaintiffs contend that K.B.'s placement in the CTT class was predetermined, as the CSE failed to consider the full continuum of services that might be appropriate for K.B., such as a smaller class or a different program. Pls.' Memo. at 10. In support of this argument, Plaintiffs cite testimony from Ms. Perez suggesting that the CSE did not consider a smaller class size. Id. A more complete reading of Ms. Perez's testimony reveals that the CSE sought to place K.B. in the least restrictive environment, and, after finding the least restrictive environment of general education with only part-time services to be "not yet appropriate," the CSE recommended the CTT class because it was "something similar but with more support." Impartial Hr'g Tr. 136. Plaintiffs also contend that the CSE failed to include Plaintiff D.B. and K.B.'s former teachers in the discussion. Pls.' Memo. at 10-11. However, as described above, the CSE incorporated input from a variety of sources, including Plaintiffs and K.B.'s teachers from the Manhattan Day School. Impartial Hr'g Tr. 60-62, 94-95, 104-105.

Because the CTT class to which K.B. would have been assigned had students with reading levels ranging from second to eighth grade and math levels ranging from second to seventh grade, Plaintiffs argue that the CTT class was inappropriate

because K.B. would not have been grouped with students with needs similar to hers. Pls.' Memo. at 13-14. While state regulations do require that special education students be "grouped by similarity of individual needs," 8 N.Y.C.R.R. § 200.6(a)(3), testimony presented before the IHO established that instruction in the CTT class used the "workshop model" where students were often placed in smaller groups and "learning stations" according to their needs and abilities. Impartial Hr'g Tr. 178-79, 181-85, 187-88, 225-26, 235-36. See also M.P.G. ex rel. J.P. v. New York City Dep't of Educ., No. 08 Civ. 8051(TPG), 2010 WL 3398256, at *10-11 (S.D.N.Y. Aug. 27, 2010) (because student was grouped for instruction in terms of her functional needs, failure to adhere to state regulations regarding age range was not fatal to district's claim that student was provided with a FAPE). The evidence also established that the class modified its pace to adjust to the needs of the students and that supplemental individual instruction was available. Impartial Hr'g Tr. 178-79, 187-88, 230-31.

Plaintiffs' argument that the CSE "pass[ed] the buck" by not selecting a specific placement for K.B., see Pls.' Memo. at 12, is without merit. The Second Circuit has endorsed the

DOE's practice of making programmatic recommendations in the IEP and then later recommending a "bricks and mortar" specific school placement to implement the recommendations. T.Y., 584 F.3d at 419-20.

There is no question that the IEP did not provide K.B. with all of the services her parents would have liked and which may be available to her at a private school. However, the IEP did provide K.B. with a FAPE in the least restrictive environment, a classroom with both special needs and non-special needs children and additional services and accommodations to address K.B.'s particular strengths and weaknesses. There is no requirement that an IEP be "sufficient to maximize each child's potential," Rowley, 458 U.S. at 198, and the requirement that each child be afforded a FAPE does not guarantee that the district "provide[] everything that might be thought desirable by loving parents." Walczak, 142 F.3d at 132.

The DOE has demonstrated that the CTT class sought to address K.B.'s educational needs while mainstreaming K.B. in a regular education class to the maximum degree possible. As such, the IEP offered K.B. a FAPE in the least restrictive

environment and the DOE has met its burden of proving the IEP to be reasonably calculated to confer educational benefits.

## VIII. No Need To Reach The Second or Third Factors of the "Burlington-Carter" Test

The parties make further arguments as to whether K.B.'s placement at P'TACH was appropriate, such that it met her educational needs and whether the equities support Plaintiffs' claim. However, a reviewing district court need not reach these questions if, as here, it determines that the IEP was adequate. See, e.g. M.P.G., 2010 WL 3398256, at *12 (citing M.C. v. Voluntown Bd. of Educ., 226 F.3d 60, 66 (2d Cir. 2000)). Therefore, it is unnecessary to address the second or third factors of the "Burlington-Carter" test.

## IX. Conclusion

For the foregoing reasons, the DOE's motion for summary judgment is granted, and the Plaintiffs' motion is denied.

**New York, NY**
**October , 2011**

**ROBERT W. SWEET**
**U.S.D.J.**